IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

ROBERT A. ALLEY,

    Plaintiff,

v.                                  No. 12-1150

CAROLYN W. COLVIN, Commissioner
of Social Security,[1]

    Defendant.
_____

ORDER AFFIRMING THE DECISION OF THE COMMISSIONER
_____

*INTRODUCTION AND PROCEDURAL BACKGROUND*

Before the Court is the Social Security action of the Plaintiff, Robert A. Alley, pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of Carolyn W. Colvin, Commissioner of Social Security, denying his claim for disability insurance benefits. In June 2008, he applied for disability and Supplemental Security Income benefits alleging disability as of April 2, 2008. The claim was denied initially on September 25, 2008, and on appeal on December 3, 2008. He requested a hearing before the Administrative Law Judge (ALJ) on January 15, 2009, and a hearing was conducted on October 25, 2010. The ALJ, Jonathan H. Leiner, issued an unfavorable decision two days later, which Alley appealed. The appeal was denied on May 7, 2012, and this action followed.

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

## STANDARD OF REVIEW

A federal court's review of the Social Security Administration's denial of a claim for benefits "is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards." *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014). "Substantial evidence requires more than a mere scintilla but less than a preponderance; substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016) (internal quotation marks omitted). "If substantial evidence supports the ALJ's decision, then reversal is unwarranted even if substantial evidence backs the opposite conclusion." *Turk v. Comm'r of Soc. Sec.*, ___ F. App'x ___, 2016 WL 2641196, at *1 (6th Cir. May 10, 2016) (citing *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)).

To establish eligibility for disability benefits, an applicant must show an inability to engage in any substantial gainful activity resulting from a long-lasting impairment. 42 U.S.C. §§ 1382c(a)(3)(A) & 423(d)(1)(A); *Taskila v. Comm'r of Soc. Sec.,* 819 F.3d 902, 903 (6th Cir. 2016).

> The Social Security Administration processes applications for relief by asking five questions: (1) Does the claimant show [he] is not engaged in substantial gainful activity? (2) Does the claimant have a severe impairment? (3) Does the impairment meet any one of the items on a list of impairments presumed severe enough to render one disabled? (4) Can the claimant perform [his] past jobs? (5) Can the claimant perform other jobs that exist in significant numbers in the national economy?

*Taskila*, 819 F.3d at 903 (internal quotation marks omitted). This standard has been described as a "modest" one. *See id.* at 904. In this case, the first four questions were answered in favor of the Plaintiff. The fifth formed the grounds for the unfavorable decision and, thus, will be the focus of the Court's attention.

*RELEVANT RECORD EVIDENCE*

Alley was born on March 27, 1965, and was forty-five years old at the time of his hearing before the ALJ. He was six feet tall and weighed, on the hearing date, 230 pounds. He obtained a GED in 1987 and had worked as a tire repairer, construction worker and trailer assembler.

The administrative record reveals that Plaintiff presented to cardiologist Kerry Morgan, M.D., on July 24, 2006, after suffering chest discomfort radiating down his arm. His blood pressure was elevated and a stress test showed an apical defect with an ejection fraction of thirty-five percent and an anterior wall that indicated dysfunction with stress. Overall ejection fraction was also thirty-five percent. Social history reflected that he smoked a pack of cigarettes a day. Chest x-ray and lab test results were normal. Dr. Morgan diagnosed unstable angina and scheduled a left heart catheterization for July 26, 2006. On that date, Alley was admitted to Magnolia Regional Health Center (MRHC) in Corinth, Mississippi, and the catheterization was performed, leading Dr. Morgan to conclude that significant circumflex disease was present. The physician conducted a percutaneous transluminal coronary angioplasty of the obtuse marginal artery with stenting of the circumflex that had a greater than eighty percent stenosis. Plaintiff was monitored overnight and discharged the next day with prescriptions for Plavix and Crestor.

Dr. Morgan also ordered a sleep study, based on daytime hypersomnolence with fatigue, frequent headaches, depression and observed loud snoring. The study, conducted on August 1, 2006, confirmed the diagnosis of mild sleep apnea, as well as mild nocturnal oxygen desaturations and mild periodic limb movements. No abnormal cardiac events were observed during the study. A nasal Continuous Positive Airway Pressure trial and titration sleep study were recommended.

Plaintiff returned to Dr. Morgan on September 6, 2006, complaining of chest pain and lower extremity swelling. The cardiologist ordered another left cardiac catheterization, which was performed on September 11, 2006. The procedure indicated mild progression with a very mild lesion distal to the stent previously placed. Dr. Morgan noted in his report relative to the lesion that "there was an area of about [twenty percent] to [thirty percent], may be slightly worse than that, but it was difficult to tell and we could not make it any worse than that." (D.E. 18-9 at PageID 304.) The claimant was kept for observation overnight for a Persantine Cardiolite functional study to be performed the next day. Findings from the study included an inferior apical wall fixed defect suggestive of scar tissue; hypokinesis of the septum, inferior wall and the apex; and decreased ejection fraction of thirty-six percent. The Plaintiff was discharged and prescribed Crestor.

Alley was treated at MRHC's emergency room on April 11, 2007, complaining of chest pain and numbness of the left hand. He reported that his pain had been partially relieved by nitroglycerin tablets. Hospital personnel performed an electrocardiogram, which detected no acute issues. Metabolic testing revealed low potassium levels. He was discharged without admittance and advised to follow up with Dr. Morgan.

During an examination by the cardiologist on April 16, 2007, the claimant reported continuing episodes of chest pain. Dr. Morgan ordered a stress test, which indicated inferior reperfusion defect, hypokinetic apical wall and decreased left ventricle ejection fraction of forty-three percent. In a regular cardiology visit on October 30, 2007, Plaintiff advised that he was experiencing ankle swelling and a kind of chest pain different from past episodes. Dr. Morgan chose to monitor the situation for the time being.

Alley received treatment at McNairy Regional Hospital for knee pain on February 8 and 20, 2008, during which he advised hospital personnel that he smoked five cigarettes per day. On March 27, 2008, he presented to the MRHC emergency department for heat burns and eye pain suffered when his eye protection failed to function properly while he was welding. He reported during the assessment process that he was able to ambulate independently and could perform all activities of daily living without assistance. The Plaintiff was instructed to follow up with his primary care physician, stay in a dark room for one day, and wear eye patches.

The claimant was examined by Dr. Morgan pursuant to complaints of chest pain and shortness of breath on April 21, 2008. The physician ordered a stress test and an echocardiogram, which were performed on April 24, 2008. Testing revealed reversible defect at the apex of the left ventricle suggestive of ischemia, hypokinesis at the apex, and decreased ejection fraction of forty-three percent. The left ventricle was normal in size, the wall thickness was mildly hypertrophied, and the wall motion was within normal limits.

Following a positive stress test in May 2008, Dr. Morgan performed another cardiac catheterization, which showed no angiographically significant disease and "[c]ertainly, nothing that matche[d] up to the stress test." (D.E. 18-11 at PageID 343-44.) During the procedure, Alley had episodes of sleep apnea and decreased pulses bilaterally in his lower extremities. A bilateral arterial duplex scan on May 16, 2008, showed minor plaque with no significant stenosis. Social history taken at the time noted that the Plaintiff smoked tobacco.

On September 25, 2008, medical consultant Barbara M. Thomas concluded, based on her review of reports from Dr. Morgan, MRHC and McNairy Regional Hospital, as well as information received from Plaintiff's mother and sister relative to his activities of daily living, which included caring for his own personal needs, performing limited yard work, laundering his

clothing twice per week, driving a car, shopping for groceries once per week, and having the ability to walk approximately one-quarter mile before needing to rest, that there were "inconsistencies" between this evidence and Alley's allegations of disability. (D.E. 18-12 at PageID 410-11.) In a Physical Residual Functional Capacity Assessment completed September 28, 2008, another non-examining medical consultant, Stephen Burge, M.D., determined that the claimant could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk or sit for about six hours in an eight-hour workday, and push and/or pull for an unlimited period. The consultant indicated no limitations with respect to posture, manipulation, vision or environment. Dr. Burge noted at the conclusion of his report that a treating or examining source statement regarding Plaintiff's physical capacities was unavailable at the time of his review. A third medical consultant, Christopher W. Fletcher, M.D., affirmed Thomas' report on November 20, 2008.

Alley visited the emergency room several times during 2009. On September 18, 2009, he appeared complaining of "moderate" back pain in the area of the lower lumbar spine after a fall at a grocery store. (D.E. 18-15 at PageID 468.) Examination was normal except for back tenderness. X-rays of the lumbar spine noted mild end plate degenerative changes to the upper lumbar spine with disc space narrowing and osteophyte formation. In an emergency department visit on October 7, 2009, for a mild cough, physicians noted normal heart rate and rhythm with no respiratory distress. Chest x-rays reflected heart and mediastinal contours within normal limits and clear and well-expanded lungs. During a subsequent emergency room examination three days later for continued cough and sore throat, physical examination indicated no breathing difficulty or respiratory distress, and normal heart rate and pulse. Chest x-ray showed normal heart size, normal lung markings and no acute disease. Pulmonary vasculature, cardiac

6

silhouette and mediastinum were within normal limits and acute cardiopulmonary findings were negative. On October 28, 2009, Alley presented to the MRHC emergency room complaining of abdominal pain. An echocardiogram was performed, resulting in an abnormal finding of sinus tachycardia showing ninety-nine beats per minute. Examination of chest and lungs revealed no abnormalities.

John B. Woods, M.D., conducted a consultative examination of the Plaintiff on February 26, 2010, which indicated regular heart rate and rhythm with no murmurs, gallops or rubs. There were no signs of vascular congestion, including hepatomegaly, peripheral or pulmonary edema, or jugular vascular distention. Dr. Woods also noted positive clubbing in the fingers of both hands and trace bipedal edema, as well as a prolonged expiratory phase and scattered crackles in the lungs. He diagnosed obstructive sleep apnea, coronary artery disease (CAD), probable chronic obstructive pulmonary disease (COPD), tobacco use by history, and degenerative disc disease of the lumber spine. The physician completed a Medical Source Statement (MSS) form concluding that the claimant was able to lift and carry up to twenty pounds only occasionally due to poor lung function, COPD and CAD; and sit for one hour, stand for fifteen minutes and walk for ten minutes at one time without interruption as a result of lower stamina due to lung and artery disease. Dr. Woods further opined that Alley, with an ability to perform sedentary and light work, could sit for a total of six hours, and stand or walk for one hour, in an eight-hour workday; had the ability to climb stairs and ramps, balance, and stoop occasionally, but could not climb ladders or scaffolds, kneel, crouch, or crawl; and could tolerate vibrations, moving mechanical parts and operating a motor vehicle, but not unprotected heights, humidity and wetness, dust, pulmonary pollutants, or temperature extremes. Finally, it was Dr. Woods' opinion that Plaintiff was unable to walk a block at a reasonable pace on a rough or uneven

surface, or to climb a few steps at a reasonable pace with the use of a single handrail, because his pace would be slow.

In a routine visit on June 23, 2010, Alley advised Dr. Morgan that he was "doing ok" and suffered from chest pain "sometimes." (*Id.* at PageID 487.) The physician noted atypical chest pain and ordered another stress test. A myocardial scan stress test performed on June 25, 2010, showed a fixed defect on the inferior wall and apex of the left ventricle suggestive of a scar, hypokinesis of the apex at the left ventricle and decreased ejection fraction of thirty-seven percent.

The Plaintiff visited MRHC's emergency department on July 1, 2010, for a left shoulder and arm injury resulting from a fall down the stairs at his home. Hospital notes revealed that, at that time, Alley lived alone, ambulated on his own and performed the activities of daily living independently. Emergency room staff placed a sling on his arm and he was discharged.

Dr. Morgan completed an MSS form on October 6, 2010, shortly before the hearing, assessing the claimant as a Class III Functional Classification heart patient, which meant, according to the form, that, in his opinion, the Plaintiff suffered from "cardiac disease resulting in marked limitation of physical activity" and was "comfortable at rest." (D.E. 18-17 at PageID 530.) The classification was also appropriate for patients where "[l]ess than ordinary physical activity causes fatigue, palpations, dyspnea or anginal pain." (*Id.*) The cardiologist further assigned to Alley a Class D Therapeutic Classification, suitable for "[p]atients with cardiac disease whose ordinary physical activity should be markedly restricted." (*Id.* at PageID 531.) The form contained no narrative discussion by Dr. Morgan.

At the hearing before the ALJ, Alley testified that he resided in a trailer with his parents and sister. He stated that the primary impairments keeping him from working were shortness of

breath and dizziness. He could sit or stand about twenty to thirty minutes at a time, walk a quarter of a mile and lift twenty to thirty pounds. He described those lifting activities as carrying groceries into the house and cleaning the yard. Plaintiff reported needing to lie down three times per day for an hour at a time due to weakness and tiredness and having to prop his legs on pillows twice a day to relieve swelling. When asked to relate how he spent an ordinary day, he responded that he picked up trash and limbs from his yard. He helped his mother with dishes, could vacuum for about five minutes, did no mopping, and did not think he could mop or sweep in reasonable comfort for any length of time. Alley testified that he could no longer exercise, walk and fish as he had in the past. He had used nitroglycerin tablets "several different times." (D.E. 18-3 at PageID 103.) The claimant related that, in approximately September 2010, he was helping an elderly neighbor remove a limb from a tree when the branch fell on him, injuring his shoulder. In addition, he mowed a neighbor's yard on a couple of occasions for fifteen minutes each time.

> The ALJ posed the following hypothetical to vocational expert (VE) James Elton Moore:
>
> Assume please for the purposes of this first hypothetical, the claimant is of the age, education, as the work history has been testified here to today [sic], transferrable skills as you've advised us, and the following pain impairments and work restrictions. Namely the claimant can occasionally lift 10 pounds. He can frequently lift less than 10 pounds. He can stand and walk for one hour in an eight-hour work day. He can sit for six hours in an eight-hour work day. The claimant can occasionally climb, balance, and stoop. He can never crouch, kneel, or crawl. And he experiences additional restrictions in working at heights, with temperature extremes, humidity, chemicals, dust, and fumes. And those are his restrictions. Based on these assumptions set forth in hypothetical number one, Dean Moore, could the claimant return to his past work?

(*Id.* at PageID 110.) Moore responded in the negative, adding he could not identify a wide range of jobs that Alley could perform.

> The ALJ then posed a second hypothetical to the VE:

9

> Assume please for purposes of this second hypothetical a claimant is of the age, education, and has the work history that has been testified to here today. Transferrable skills as you've advised us and the following pain impairments and work restrictions. Mainly in the second hypothetical, the claimant could occasionally lift 20 pounds and frequently lift less than 10 pounds. The claimant could stand and walk for two hours in an eight-hour work day. He can sit for six hours in an eight-hour work day. He can occasionally climb, balance, and stoop. He can never kneel, crouch, or crawl. He experiences additional restrictions in working at heights and with temperature extremes, humidity, chemicals, dust, and fumes. Those are his restrictions. Based on the assumptions set forth in hypothetical number two, Dean Moore, could the claimant return to his past work?

(*Id.* at PageID 110-11.) Again, Moore was of the opinion that he could not, but identified a variety of jobs, both at sedentary and light levels, such an individual could perform, including work as a ticket seller and at a machine tending or assembly job such as a lampshade assembler or napper tender. Plaintiff's counsel asked the VE whether his opinion would change if, under the second hypothetical, the individual was required to take two to three one-hour rest periods during the workday. Moore replied that, under those circumstances, he would be unable to identify a wide range of jobs such a person could perform.

## *THE ADMINISTRATIVE DECISION*

Upon hearing testimony and reviewing the evidence, the ALJ determined that, although the claimant suffered from obesity, hypertension, cardiac disorders, COPD, obstructive sleep apnea, a back disorder and a right knee disorder, which constituted severe impairments for purposes of the Social Security Regulations, the record evidence "fail[ed] to demonstrate that the claimant's impairments [met] or equal[ed] in severity the requirements of any Listing contained within the Listing of Impairments set forth at Appendix 1 to the Regulations." (*Id.* at PageID 83.) He concluded that Alley's "medically determinable impairments cannot reasonably be expected to impose symptoms of the persistence and intensity as he alleges." (*Id.* at PageID 81.) He further found his subjective complaints and hearing testimony to be less than fully credible,

noting his professed use of nitroglycerin tablets for which there is no record of a prescription and his failure to seek more than minimal treatment for an asserted debilitating cardiac impairment after the spring of 2008.

It was the ALJ's opinion that Plaintiff could lift twenty pounds occasionally and ten pounds less frequently; stand and walk for two hours and sit for six hours in an eight-hour workday; and occasionally climb, balance and stoop but never kneel, crouch, or crawl. He noted additional restrictions in working at heights and in environments of temperature extremes, humidity, chemicals, dust and fumes. Based on a residual functional capacity (RFC) for sedentary to light work and other vocational factors, the ALJ ruled that "a significant number of jobs exists in the national economy which the claimant can perform. This finding is based upon the framework of Medical-Vocational Sections 202.21 and 201.21 and upon the testimony of the impartial vocational expert." (*Id.* at PageID 84.) Accordingly, the ALJ concluded that Plaintiff was not disabled. In reaching his conclusion, the ALJ stated in connection with Dr. Morgan's opinions generally as follows:

> His (Dr. Morgan's) opinion of the claimant's supposed stringently reduced exertional abilities *in theory*, however, is contradicted by the claimant's conceded repeated performance of robust physical activities *in fact*. The claimant as noted conceded that he pulled the limb of a tree in September 2010. He conceded that he has mowed the lawn of his neighbor on two occasions each for 15 minutes. He conceded that he can lift 20 to 30 pounds. The undersigned therefore respectfully affords limited weight to the opinion of Dr. Morgan.

(*Id.* at PageID 82.) The ALJ accorded weight to Dr. Woods' determination that the Plaintiff could perform sedentary to light work as it was consistent in most respects with the whole of the record evidence. He discounted, however, Dr. Woods' assessment that the claimant had no ability to perform frequent lifting on the grounds that the opinion "appear[ed] somewhat in excess of the record evidence." (*Id.*)

*ANALYSIS*

As noted in a previous section, it is the final phase of the Commissioner's five-step sequential analysis that is at issue here. Although the burden of demonstrating a right to benefits rests on the shoulders of the Plaintiff through the first four steps, it shifts to the Commissioner to establish the fifth. *Luukkonen v. Comm'r of Soc. Sec.*, ___ F. App'x ___, 2016 WL 3426370, at *3 n.5 (6th Cir. June 22, 2016). The Commissioner's burden "is to prove the availability of jobs in the national economy that the claimant is capable of performing." *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008). "The claimant, however, retains the burden of proving [his] lack of residual functional capacity." *Id.* Criteria that may be used to inform a determination as to the fifth factor include "the extent of a claimant's disability, the reliability of the [VE]'s testimony [and] the reliability of the claimant's testimony[.]" *Taskila*, 819 F.3d at 904 (internal quotation marks omitted).

The Plaintiff challenges the ALJ's unfavorable ruling on two grounds. First, he contends that the ALJ's decision at the fifth step was not supported by substantial evidence and, second, he submits that the ALJ failed to provide good reasons for not giving controlling weight or deference to Dr. Morgan's opinions. Because they are related, the Court will address them together.

Alley maintains there is no substantial proof in the record that he retained the RFC articulated by the ALJ. "In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." *Defrank v. Colvin*, Case No. 4:15-cv-1473, 2016 WL 3898441, at *9 (N.D. Ohio

July 19, 2016) (quoting *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010)). Specifically, Plaintiff objects to the ALJ's determination that he could perform *any* lifting at a frequent level and, thus, asserts that the ALJ's hypothetical questions to the VE referencing an ability to lift less than ten pounds frequently were not adequate portrayals of his physical impairments.[2]

"Frequently" has been defined as one-third to two-thirds of a workday. *See Blanton v. Inco Alloys Int'l, Inc.*, 108 F.3d 104, 107 n.3 (6th Cir. 1997); Soc. Sec. Ruling 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983). As noted above, the ALJ considered the opinion of the treating physician, Dr. Morgan, as well as that of Dr. Woods, and declined to accord weight to assessments that Plaintiff had no ability to perform any frequent lifting because they did not appear to comport with the record evidence.

The ALJ is required to comply with certain standards in assessing medical evidence offered in support of a disability claim. *Gentry*, 741 F.3d at 723.

---

[2]Alley also points out in conclusory fashion that the VE failed to identify the Dictionary of Occupational Titles ("DOT") numbers for the jobs -- ticket seller, lampshade assembler and napper tender -- that he opined the claimant could perform. However, the Court notes that this failure is not necessarily fatal to an ALJ's determination, *see Espey v. Comm'r of Soc. Sec.*, Civil Case No. 13-14859, 2015 WL 1197808, at *10 (E.D. Mich. Mar. 16, 2015) (Commissioner's burden was satisfied where the ALJ determined the claimant's RFC, applied that capacity in his discussion with the VE about the kinds of jobs he could perform and the VE then described types of jobs plaintiff could perform and testified that such jobs existed in significant numbers in the economy, despite VE's failure to tie job descriptions to the DOT) (adopting report & recommendation). Moreover, the claimant does not elaborate on his argument or cite to any authority in support thereof. Accordingly, the Court will not discuss this issue further. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones."); *see also Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir. 2006) (in Social Security appeal, a claimant's observations with respect to the ALJ's findings "without elaboration or legal argument, failing even to hint at their legal significance or virtue," are generally waived, citing *McPherson*).

> Chief among these is the rule that the ALJ must consider all evidence in the record when making a determination, including all objective medical evidence, medical signs, and laboratory findings. The second is known as the "treating physician rule," requiring the ALJ to give controlling weight to a treating physician's opinion as to the nature and severity of the claimant's condition as long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. The premise of the rule is that treating physicians have the best detailed and longitudinal perspective on a claimant's condition and impairments and this perspective cannot be obtained from objective medical findings alone. Even when not controlling, however, the ALJ must consider certain factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability of the physician's conclusions; the specialization of the physician; and any other relevant factors. In all cases, the treating physician's opinion is entitled to great deference even if not controlling.

*Id.* (internal alterations, citations & some quotation marks omitted). "An ALJ must provide 'good reasons' for discounting the opinion of a treating source," such as Dr. Morgan. *Cosma v. Comm'r of Soc. Sec.*, ___ F. App'x ___, 2016 WL 3209500, at *1 (6th Cir. June 10, 2016) (per curiam). "The stated reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (internal quotation marks omitted).

It is the Plaintiff's position that the ALJ should have given greater weight to the MMS of his treating physician reflecting his narrowly limited exertional abilities. He also submits that his activities of helping a neighbor pull a limb from a tree, which resulted in the limb falling on him, and mowing a neighbor's yard twice at intervals of fifteen minutes fell short of qualifying for the "robust" descriptor assigned to them by the ALJ.

However, it appears from a reading of the ALJ's opinion that he found the testimony of Alley himself more compelling than the assessment provided by his treating physician. That proof revealed that the claimant regularly removed tree limbs from his yard and carried

groceries, both of which he claimed required him to lift twenty to thirty pounds, and that he cared for his personal needs. The testimony was bolstered by the third person activities of daily living reports of his mother and sister as related to Thomas. Moreover, the eye flash injury Plaintiff experienced in March 2008 while welding suggests that he could lift and hold a welding torch. According to hospital records, he lived alone for a period of time during which he cared for himself and his needs, which conflicts somewhat with his claims of being unable to lift any weight frequently. *See Berry v. Comm'r of Soc. Sec.*, 289 F. App'x 54, 56 (6th Cir. 2008) ("Berry's ability to live independently and perform regular household activities belies her claim that she is totally disabled."); *Boner-Clark v. Colvin*, Case No. 1:15-cv-13, 2016 WL 889577, at *6 (S.D. Ohio Feb. 8, 2016) (upholding ALJ's reliance, in denying benefits, on plaintiff's activities of daily living, which were inconsistent with her treating physician's assessment, citing *Berry*), *report & recommendation adopted by* 2016 WL 879963 (S.D. Ohio Mar. 8, 2016). Finally, Alley's continued use of tobacco for at least two years after stint implantation undermines assertions on his part of disabling cardiopulmonary symptoms. *See Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988) (per curiam); *Willard v. Comm'r of Soc. Sec.*, Case No. 1:13-cv-01250-STA-dkv, 2016 WL 3637201, at *5 (W.D. Tenn. June 30, 2016). As the Sixth Circuit noted in *Sias*,

> [t]he Social Security Act did not repeal the principle of individual responsibility. Each of us faces myriads of choices in life, and the choices we make, whether we like it or not, have consequences. If the claimant in this case chooses to drive himself to an early grave, that is his privilege -- but if he is not truly disabled, he has no right to require those who pay social security taxes to help underwrite the cost of his ride.

*Sias*, 861 F.2d at 480.

Thus, while there is evidence in the record to support a favorable ruling, the Court cannot say that substantial evidence was lacking to support the ALJ's RFC assessment. The record

reflects that the ALJ considered and accurately recounted the relevant evidence, including Alley's daily activities as he reported them, and clearly explained his reasons for discounting the opinion of Dr. Morgan, echoed by Dr. Woods, suggesting that the claimant could not lift any weight frequently.[3] The ALJ also identified the evidence he considered less than credible and provided justification for why he found it so. Even though Plaintiff takes issue with the hypothetical questions posed to the VE, there is no error where the ALJ's questions, as was the case here, included only those limitations he found credible and supported by the evidence. *See Spicer v. Comm'r of Soc. Sec.*, ___ F. App'x ___, 2016 WL 3194700, at *2 (6th Cir. June 9, 2016) (per curiam); *Boner-Clark*, 2016 WL 889577, at *11.

## *CONCLUSION*

For the reasons articulated herein, the Commissioner's determination will be AFFIRMED. A separate judgment shall issue.

IT IS SO ORDERED this 15th day of August 2016.

                                                 s/ J. DANIEL BREEN
                                                 CHIEF UNITED STATES DISTRICT JUDGE

---

[3] The Court notes that one of the jobs identified by the VE -- ticket seller -- involved "very little lifting at all." (D.E. 18-3 at PageID 113.)